OPINION
WILLIAM C. KOCH, JR., J.,
delivered the opinion of the court,
in which WILLIAM M. BARKER, C.J., CORNELIA A. CLARK, and GARY R. WADE, JJ., joined. JANICE M. HOLDER, J., filed a separate concurring and dissenting opinion.
This appeal involves the efforts of the estate of a twenty-five-year-old woman who contracted mesothelioma to recover damages for her death. While she was alive, the woman filed a negligence action against her father’s employer, alleging that the employer had negligently permitted her father to wear his asbestos-contaminated work clothes home from work, thereby regularly and repeatedly exposing her to asbestos fibers over an extended *352 period of time. After the woman died, the Circuit Court for Blount County permitted her father to be substituted as the personal representative of her estate. The employer moved for a judgment on the pleadings on the narrow ground that it owed no duty to its employee’s daughter. The trial court granted the motion. The deceased woman’s father appealed the dismissal of his daughter’s wrongful death claim. The Tennessee Court of Appeals reversed the trial court. Satterfield v. Breeding Insulation Co., No. E2006-00903-COA-R3-CV, 2007 WL 1159416 (Tenn.Ct.App. Apr.19, 2007). We granted the employer’s application for permission to appeal to determine whether the deceased woman’s complaint can withstand a motion for judgment on the pleadings. We have determined that it does because, under the facts alleged in the complaint, the employer owed a duty to those who regularly and for extended periods of time came into close contact with the asbestos-contaminated work clothes of its employees to prevent them from being exposed to a foreseeable and unreasonable risk of harm.
The only issue on this appeal is whether the complaint of a woman who succumbed to mesothelioma should have been dismissed solely because the defendant did not have a duty to act reasonably to prevent her from being exposed repeatedly and regularly over an extended period of time to the asbestos fibers on her father’s work clothes. The purpose of this appeal is not to determine whether, in fact, the defendant was negligent or whether its conduct caused the woman’s death. Because the complaint was dismissed in response to a Tenn. R. Civ. P. 12.03 motion, the facts contained in this opinion are those found in the challenged complaint.[1]
I.
Alcoa, Inc.[2] is an international manufacturer of aluminum and aluminum products. It owns and operates facilities in various locations throughout the United States, including a facility in Alcoa, Tennessee. Alcoa uses materials containing asbestos in many of its manufacturing operations. Since the 1930s, Alcoa has been aware that asbestos is a highly dangerous substance, and it has closely monitored the research into the dangers posed by asbestos.
Beginning in the 1940s, Alcoa opened its own internal hygiene department which provided directives to Alcoa’s local facilities regarding the handling of materials containing asbestos. Because of the frequent use of materials containing asbestos in its manufacturing processes, Alcoa was aware that the air in its factories contained high levels of asbestos fibers and that its employees were being exposed to these fibers on a daily basis.
Alcoa became aware in the 1960s that the dangers posed by asbestos fibers extended beyond its employees who were in constant direct contact with the materials *353 containing asbestos or the asbestos fibers in the air. It learned that even intermittent exposure to low levels of asbestos fibers resulted in an increased risk of disease. At approximately the same time, Alcoa also learned that persons living near facilities that made extensive use of materials containing asbestos were experiencing higher disease rates, as were the family members of its employees who were being exposed regularly and repeatedly to the asbestos fibers on the employees’ work clothes.
In 1972, the Occupational Safety and Health Administration (“OSHA”) promulgated regulations prohibiting employees who had been exposed to asbestos from taking their work clothes home to be laundered. Tests that Alcoa conducted at a number of its facilities, including those in Tennessee, revealed that the levels of asbestos fibers on the workers’ clothes were extremely high.
In 1973, Doug Satterfield began working at Alcoa’s facility in Alcoa, Tennessee. He worked there for two years until he entered the United States Army in 1975. After three years of military service, Mr. Satterfield resumed working at the Alcoa plant in 1978. He continued to work for Alcoa until at least 1984. His job assignments resulted in his exposure to high levels of asbestos dust and fibers on a daily basis.
Contrary to the OSHA regulations, Alcoa failed to educate Mr. Satterfield and its other employees regarding the risk of asbestos or how to handle materials containing asbestos. Even though Alcoa’s employees worked extensively with materials containing asbestos, these materials did not contain warning labels or notices stating that they contained asbestos. Despite the fact that Alcoa was aware of the dangers posed by asbestos before Mr. Satter-field became an employee, it failed to apprise him or its other employees of the dangers of asbestos or specifically of the danger associated with wearing home their asbestos-contaminated work clothes. In addition, Alcoa failed to provide protective coveralls for its employees, discouraged the use of its on-site bathhouse facilities, and did not offer to launder its employees’ work clothes at its facility. Accordingly, Alcoa’s employees, including Mr. Satter-field, left the plant each day unaware of the dangers posed by the asbestos fibers on their contaminated work clothes and without Alcoa making an effort to prevent others from being exposed to the asbestos fibers on its employees’ clothes.
On September 7, 1979, Amanda Nicole Satterfield was born to Mr. Satterfield and Donna Satterfield. Because her birth was premature, she was required to spend the first three months of her life at the University of Tennessee Hospital in Knoxville, Tennessee. Mr. Satterfield visited his infant daughter every day she was hospitalized. He came to the hospital immediately after work wearing his asbestos-contaminated work clothes and stayed with his daughter until late into the evening. Thus, from the day of her birth, Ms. Sat-terfield was exposed to the asbestos fibers on her father’s work clothes.
Ms. Satterfield was eventually diagnosed with mesothelioma. On December 8, 2003, she filed suit against Breeding Insulation Company, Inc. (“Breeding”) and Alcoa in the Circuit Court for Knox County. She alleged that mesothelioma is a highly lethal form of cancer that is almost exclusively caused by exposure to asbestos and that she contracted mesothelioma as a direct result of the negligent acts and omissions of both Breeding and Alcoa.[3] The *354 case was transferred to the Circuit Court for Blount County on February 11, 2004.
Ms. Satterfield died from mesothelioma on January 1, 2005. The trial court granted the motion filed by Mr. Satterfield, as the representative of his daughter’s estate, to be substituted as plaintiff. The trial court also allowed Mr. Satterfield to amend his daughter’s complaint to assert that the negligent acts and omissions of Alcoa and Breeding proximately caused his daughter’s death.
On December 16, 2005, Alcoa filed a Tenn. R. Civ. P. 12.03 motion for judgment on the pleadings. Alcoa asserted that “as a matter of law it owed no legal duty to Amanda Nicole Satterfield.” Following a hearing on January 30, 2006, the trial court filed an order on March 31, 2006, dismissing Ms. Satterfield’s complaint[4] on the ground that “there is no provision in Tennessee law (either through the Legislature or Court interpretation) that imposes on Alcoa a legal duty to a third party under the facts and circumstances of this case.” Satterfield v. Breeding Insulation Co., No. L-14000, 2006 WL 901725, at *1 (Blount Cir. Ct. Mar. 31, 2006).
On April 10, 2006, Mr. Satterfield voluntarily dismissed Ms. Satterfield’s claims against Breeding. Thereafter, on April 27, 2006, Mr. Satterfield, on behalf of his daughter’s estate, appealed from the trial court’s dismissal of Ms. Satterfield’s claims against Alcoa. On April 19, 2007, the Tennessee Court of Appeals filed an opinion reversing the dismissal of Ms. Satterfield’s complaint after concluding that the trial court had erred by holding that Alcoa owed no duty to Ms. Satterfield under the facts alleged in the complaint. Satterfield v. Breeding Insulation Co., No. E2006-00903-COA-R3-CV, 2007 WL 1159416, at *4-10 (Tenn.Ct.App. Apr.19, 2007).
Alcoa filed a Tenn. R.App. P. 11 application for permission to appeal. Because strikingly similar issues related to “take-home” or “transmission” asbestos exposure cases have sharply divided courts throughout the country and because this case implicates core principles of Tennessee’s tort law, we granted Alcoa’s application for permission to appeal. We have determined that the trial court erred by dismissing Ms. Satterfield’s complaint and that the Court of Appeals properly reversed the trial court’s dismissal of the complaint. Based on the facts alleged in the complaint, Alcoa owed a duty of reasonable care to Ms. Satterfield.
II.
In its most succinct form, the pivotal question in this case is whether, under the facts alleged in Ms. Satterfield’s complaint, Alcoa owed a duty of reasonable care to Ms. Satterfield. Alcoa asserts that it did not owe a duty to Ms. Satterfield. It contends that imposing such a duty on it would improperly create an affirmative obligation to act despite the absence of any *355 special relationship between Alcoa and either Ms. Satterfield or her father. On the other hand, Mr. Satterfield insists that his daughter’s complaint is premised on the assumption that Alcoa owed Ms. Satter-field a duty of reasonable care because it created an unreasonable and foreseeable risk of harm to her.
A.
The underlying dispute in this case is fundamentally one of characterization and classification. Has Alcoa engaged in an affirmative act that created an unreasonable and foreseeable risk of harm to Ms. Satterfield? If Alcoa did create such a risk of harm, are there countervailing legal principles or policy considerations that warrant determining that Alcoa nevertheless owed no duty Ms. Satterfield? Or, alternatively, does this case involve an omission by Alcoa in failing to control the actions of Mr. Satterfield, its employee? If so, then does Alcoa have the sort of special relationship with either Mr. Satter-field or Ms. Satterfield that gives rise to a duty to restrain Mr. Satterfield or to protect Ms. Satterfield? The answers to these questions emerge from considerations of precedent and public policy, as well as the basic foundations of Tennessee’s tort law.
To prevail on a negligence claim, a plaintiff must establish (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. Naifeh v. Valley Forge Life Ins. Co., 204 S.W.3d 758, 771 (Tenn.2006); Draper v. Westerfield, 181 S.W.3d 283, 290 (Tenn.2005). Although not originally required under the English common law, duty has become an essential element of all negligence claims, as well as a question of law to be determined by courts. West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d 545, 550 (Tenn.2005); Bradshaw v. Daniel, 854 S.W.2d 865, 869 (Tenn.1993). Thus, if Alcoa does not owe a duty to Ms. Satter-field, her claim must fail.
B.
Duty is a legal obligation to conform to a reasonable person standard of care in order to protect others against unreasonable risks of harm. Burroughs v. Magee, 118 S.W.3d 323, 328-29 (Tenn.2003); Staples v. CBL & Assocs., 15 S.W.3d 83, 89 (Tenn.2000). As a general rule, persons have a duty to others to refrain from engaging in affirmative acts that a reasonable person “should recognize as involving an unreasonable risk of causing an invasion of an interest of another” or acts “which involve[] an unreasonable risk of harm to another.” Restatement (Second) of Torts §§ 284, 302, at 19, 82 (1965). Thus, if an individual “acts at all, [he or she] must exercise reasonable care to make his [or her] acts safe for others.” Restatement (Second) of Torts § 4 cmt. b, at 8. The core of negligence is the violation of this requirement by engaging in “behavior which should be recognized as involving unreasonable danger to others.” W. Page Keeton, Prosser and Keeton on the Law of Torts § 31, at 169 (5th ed.1984) [hereinafter “Prosser and Keeton ”].
These rules do not, however, require that persons always act reasonably to secure the safety of others. Rather, they serve a more limited role as restraints upon a person’s actions that create unreasonable and foreseeable risks of harm to others. Expounding upon this point more than a century ago, Professor Francis H. Bohlen asserted that “[t]here is no distinction more deeply rooted in the common law and more fundamental than that between misfeasance and non-feasance, be *356 tween active misconduct working positive injury to others and passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant.” [5] While the primacy of this distinction is certainly subject to debate, that it has played a significant role in the formation of the law of negligence is beyond reasonable dispute.
Professor Bohlen is not the only scholar to offer an eloquent and enlightening articulation of the distinction between misfeasance and nonfeasance. Dean Keeton and Dean Prosser explained the distinction as follows:
In the determination of the existence of a duty, there runs through much of the law a distinction between action and inaction.... [Tjhere arose very early a difference, still deeply rooted in the law of negligence, between “misfeasance” and “nonfeasance” — that is to say, between active misconduct working positive injury to others and passive inaction or a failure to take steps to protect them from harm. The reason for the distinction may be said to lie in the fact that by ‘misfeasance’ the defendant has created a new risk of harm to the plaintiff, while by ‘nonfeasance’ he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs.
Prosser and Keeton § 56, at 373.[6] Similarly, Professor Fowler V. Harper and Judge Posey M. Kime offered the following explanation:
The man who has undertaken a definite course of continuous action thus brings himself into relation with other human beings within the zone of possible danger, to an extent requiring that precaution against bodily harm to such persons which a reasonable man under the circumstances would take. If he fails to do so, this is characterized as misfeasance. In other words, an actor is always under the duty to see that other persons are not immediately exposed to an unreasonable risk from his acts. On the other hand, a previous course of action, not in itself creating risks to others, may have brought the actor into certain socially recognized relations with others which are of such a character as to require affirmative acts to protect them from risks which the person thus required to act had no part in creating. The failure to perform such an act is described as non-feasance.
Fowler V. Harper & Posey M. Kime, The Duty to Control the Conduct of Another, 43 Yale L.J. 886, 887 (1934) [hereinafter “Harper & Kime”].[7]
The distinction between misfeasance and nonfeasance can be easily misunderstood. One can be led astray by thinking that a defendant’s negligent act must be characterized “as an affirmative act for a duty to exist, rather than appreciating that it is the defendant’s entire course of conduct that must constitute an affirmative act creating a risk of harm and that negligence may consist of an act or omission creating an unreasonable risk.”[8] *357 A classic illustration of this point is the example of a driver who fails to apply his or her brakes to avoid hitting a pedestrian walking in a crosswalk. Even though the driver’s negligent act — failing to apply the brakes — is an omission, the “driver’s careless failure to apply the brakes is negligent driving, not negligent failure to rescue.”[9] Accordingly, distinguishing between misfeasance and nonfeasance can best be accomplished, not by focusing on whether an individual’s “specific failure to exercise reasonable care is an error of commission or omission,” but rather by focusing on whether the individual’s entire course of conduct created a risk of harm.[10] Thus, even though the specific negligent act may constitute an omission, the entirety of the conduct may still be misfeasance that created a risk of harm.[11]
The distinction between misfeasance and nonfeasance is far from academic. It has practical significance, and Tennessee’s courts regularly employ it when called upon to decide whether a duty exists. See, e.g., Bradshaw v. Daniel, 854 S.W.2d at 870; Newton v. Tinsley, 970 S.W.2d at 492. With regard to misfeasance, this Court has held that “all persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others.” Burroughs v. Magee, 118 S.W.3d at 328; Bradshaw v. Daniel, 854 S.W.2d at 870. As for nonfea-sance, Tennessee’s courts generally have declined to impose a duty to act or to rescue. Bradshaw v. Daniel, 854 S.W.2d at 870; Newton v. Tinsley, 970 S.W.2d at 492. Simply stated, persons do not ordinarily have a duty to act to protect others from dangers or risks except for those that they themselves have created. Biscan v. Brown, 160 S.W.3d 462, 478-79 (Tenn.2005); Nichols v. Atnip, 844 S.W.2d 655, 661 (Tenn.Ct.App.1992).
Tennessee’s general rule with regard to nonfeasance is consistent with the Restatement’s position that “[t]he fact ... the actor realizes or should realize that action on his part is necessary for another’s aid or protection does not of itself impose upon him a duty to take such action.” Restatement (Second) of Torts § 314, at 116. This general and long-standing principle of tort law, often termed either the “no duty to act rule” or the “no duty to rescue rule” has been subject to considerable and enduring criticism.[12]
A compelling argument in opposition to the no duty to act or to rescue rule rests comfortably “on the perception that, as a matter of inarticulate common sense, it is wrong for one person to stand by as another suffers an injury that could easily be *358 prevented.”[13] An expert swimmer who stands on the shore watching a child drown or a passerby on the bridge who cannot be bothered to throw a rope to a person in distress in the waters below stand as illustrations that demonstrate the unreasonableness that can be exemplified by a failure to rescue. Even staunch defenders of the no duty to act or to rescue rule must concede that failure to do so may, in certain circumstances, not only be unreasonable, a normal measure for negligent conduct, but actually “outrageous.”[14]
Nevertheless, common-law courts, including Tennessee’s courts, have preserved, though not inviolably, the no duty io act or to rescue rule. The reason is not intransigency or lack of consideration. Quite to the contrary, the rule survives because its limitations continue to be of considerable importance and value. Imposing a duty to act or to rescue strays dangerously into interference with individual liberty.[15] By adhering to a no duty to act or to rescue rule, the courts are not rendering the common law amoral but instead are prioritizing liberty over altruism in circumstances where the defendant did not create the risk of harm.[16] While a person who fails to act may well be subject to public censure, not all failures to act should be prohibited or punished by force *359 of law.[17] Failure to leave sufficient space outside the dictates of the law may have an adverse effect on the exercise of private judgment which is critical to the development of a person’s moral capacities.[18]
While society may be outraged at the conduct of someone who fails to act, there is no concomitant sense that persons who fail to act should be required to pay financial compensation because the harm was not caused by that person’s failure to act.[19] The expert swimmer or the indifferent passerby on the bridge may be worthy of social approbation, but financial compensation for failing to act to avert a danger not caused by the unwilling rescuer hardly seems appropriate.[20] In addition, it has been asserted that recognizing a duty to act or to rescue rule could create problems of comprehensibility, verifiability, and con-formability, as well as administrative difficulties, to such an extent that maintaining the current no duty to act or to rescue rule, while not perfect, is still the superior course.[21]
C.
Searching for reasonable ground between the competing viewpoints surrounding the no duty to act or to rescue rule, Tennessee’s courts have maintained the general rule but have carved out exceptions to mitigate against some of its harshest applications. See, e.g., Bradshaw v. Daniel, 854 S.W.2d at 871; Newton v. Tinsley, 970 S.W.2d at 492. These exceptions arise when certain special relationships exist between the defendant and either the person who is the source of the danger or the person who is foreseeably at risk from the danger. Biscan v. Brown, 160 S.W.3d at 478-79; Bradshaw v. Daniel, 854 S.W.2d at 871.[22] These relation *360 ships create an affirmative duty either to control the person who is the source of the danger or to protect the person who is endangered. See Restatement (Second) of Torts §§ 314A, B; 315, at 118,122.[23]
The recognition by Tennessee’s courts of these exceptions to the no duty to act or to rescue rule is consistent with decisions of other state courts. During the post World War II era, the number of exceptions to the no duty to act or to rescue rule based on special relationships has expanded.[24] While there are many potential justifications for these departures from the general rule, among the most straightforward of justifications is that the nature of the particular relationship creates a sufficiently significant obligation that there is an enforceable expectation of reasonable action rather than unreasonable indifference.[25]
Accordingly, Tennessee law provides that while “an actor is always bound to prevent his acts from creating an unreasonable risk to others, he is under the affirmative duty to act to prevent another from sustaining harm only when certain socially recognized relations exist which constitute the basis for such legal duty.” Turner v. Jordan, 957 S.W.2d 815, 818 (Tenn.1997) (quoting Bradshaw v. Daniel, 854 S.W.2d at 871); Nichols v. Atnip, 844 S.W.2d at 661.[26] In other words, the approach of Tennessee’s courts is largely consistent with the Restatement view that
[n]ormally, where there is an affirmative act which affects the interests of another, there is a duty not to be negligent with respect to the doing of the act. On the other hand, where the negligence of the actor consists in a failure to act for the protection or assistance of another, *361 there is normally no liability unless some relation between the actor and the other, or some antecedent action on the part of the actor,[27] has created a duty to act for the other’s protection or assistance.
Restatement (Second) of Torts, Ch. 12, Topic 4, Scope Note, at 66.[28]
III.
Courts across the country have disagreed as to how these broad principles of tort law should be used to determine whether an employer owes a duty to persons who develop asbestos-related illnesses after exposure to asbestos fibers on its employees’ clothing. Although the courts have reached inconsistent conclusions,[29] a pattern has begun to emerge. The courts that ultimately recognize the existence of a duty when faced with facts similar to this case have focused on the foreseeability of harm resulting from the employer’s failure to warn of or to take precautions to prevent the exposure. On the other hand, the courts finding that no duty exists have focused on the relationship — or lack of a relationship — between the employer and the injured party. See In re Asbestos Litig., C.A. No. 04C-07-099-ASB, 2007 WL 4571196, at *3 (Del.Super.Ct. Dee.21, 2007).
A.
The opinions of many state courts contain well-reasoned and insightful analyses of the legal principles implicated in these so-called “take-home” asbestos exposure cases. Even though the outcomes in these cases differ, their principled disagreements are captured and synthesized in two particularly edifying recent cases.
Last year, the Michigan Supreme Court addressed the question presently before this Court. The majority of the court held that no liability could be imposed on the employer in the absence of a relationship between the plaintiff and the employer. In re Certified Question from Fourteenth Dist. Ct.App. of Tex., 479 Mich. 498, 740 N.W.2d 206, 213 (2007). The majority reasoned that the
defendant, as owner of the property on which asbestos-containing products were located, did not owe to the deceased, who was never on or near that property, a legal duty to protect her from exposure to any asbestos fibers carried home on the clothing of a member of her household who was working on that property as the employee of independent contractors, where there was no further relationship between defendant and the deceased.
*362 In re Certified Question from, Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 222. In a vigorous dissent, Justice Michael F. Cavanagh offered the following rebuttal:
[T]he majority’s severely curtailed view of “relationship” seems to be based on its view of premises liability law rather than on the principles of ordinary negligence. Under the latter (and the former as well, although that is not at issue here), a harmed person need not visit the property of the injuring party. This case involves an employer who exposed a worker to asbestos, knowing that the asbestos fibers were toxic and could be earned home, thus exposing the worker’s family to asbestos. Under these circumstances, I have no difficulty concluding that the relationship — that a jury found defendant had to [the employee] — extended to [the step-daughter]. To conclude otherwise, as does the majority, ignores basic negligence principles and gives employers carte blanche to expose workers to communicable toxic substances without taking any measure whatsoever to prevent those substances from harming others. This I cannot do. Indeed, as discussed later in this dissent, our government also refuses to grant this free pass.
In re Certified Question from, Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 225 (Cavanagh, J., dissenting).
Also within the past year, the Washington Court of Appeals addressed the argument that “employer liability does not extend to employees’ spouses and homes, and premises liability does not extend outside the premises.” Rochon v. Saberhagen Holdings, Inc., No. 58579-7-1, 2007 WL 2325214, at *3 (Wash.Ct.App. Aug.13, 2007). The court noted that the employer’s argument missed the central point of the case because the plaintiffs cause of action did not depend on premises liability principles or on the employer’s duty to protect the plaintiff from the acts of third parties. Rather, as the court noted, the plaintiffs claim was based on the employer’s own unreasonably risky acts-operating its factory in an unsafe manner-that directly and proximately caused her injuries. Rochon v. Saberhagen Holdings, Inc., 140 Wash.App. 1008, 2007 WL 2325214, at *3. The court also held that the employer had a duty to prevent the foreseeable injuries caused by its misfeasance because its operation of its plant created an unreasonable risk of harm of asbestos exposure to others who came in regular contact with its employees. Rochon v. Saberhagen Holdings, Inc., 140 Wash.App. 1008, 2007 WL 2325214, at *3.
B.
While the courts, like the Michigan Supreme Court, that have found, as a matter of law, that employers have no duty in take-home asbestos exposure cases, rely upon the absence of a special relationship, this argument is misplaced under Tennessee tort law as it has developed over the years. This Court has recognized that a duty of reasonable care arises whenever a defendant’s conduct poses an unreasonable and foreseeable risk of harm to persons or property. McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn.1995). Thus, like the drafters of the new Restatement (Third) of Torts containing the principles applicable to liability for physical harm, we are of the view that
[e]ven when the actor and victim are complete strangers and have no relationship, the basis for the ordinary duty of reasonable care ... is conduct that creates a risk to another. Thus, a relationship ordinarily is not what defines the line between duty and no-duty; conduct creating risk to another is.
*363 Restatement (Third) of Torts § 37, Reporter’s Note, cmt. c, at 721. Because the requirement of privity no longer plays a role in negligence claims, “[w]hen a defendant causes physical harm through misfeasance- — affirmative acts of negligence— rather than nonfeasance, he [or she] is liable to the foreseeably injured person for the harm.” 2 Dan B. Dobbs, The Law of Torts § 321, at 870 (2001).
Whether a case involves a simple automobile accident or a complicated toxic tort, Tennessee law currently provides that one owes a duty to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm to others. Draper v. Westerfield, 181 S.W.3d at 291; Biscan v. Brown, 160 S.W.3d at 478; Burroughs v. Magee, 118 S.W.3d at 328-29; McCall v. Wilder, 913 S.W.2d at 153.
Our decision in West v. East Tennessee Pioneer Oil Co. illustrates this principle. That case required us to determine whether a convenience store had a duty to the occupants of a vehicle who were injured when an intoxicated motorist struck their vehicle after the store’s employees had helped the obviously intoxicated motorist fuel his vehicle shortly before the accident. The store asserted that the intoxicated motorist was only a customer and, therefore, that no special relationship existed between the store and the intoxicated driver that would be sufficient to require the store employees to control the intoxicated driver’s conduct. West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d at 551.
We did not hold that the convenience store’s liability was predicated on the existence of a special relationship between the store and the intoxicated driver. Instead, we held that
the defendant misconstrues the plaintiffs’ claims as being based upon a “special relationship” arising from the sale of gasoline to Mr. Tarver (the intoxicated driver). The plaintiffs’ allegations do not revolve around any duty of the defendant to control the conduct of a customer. Instead, the claims are predicated on the defendant’s employees’ affirmative acts in contributing to the creation of a foreseeable and unreasonable risk of harm, i.e., providing mobility to a drunk driver which he otherwise would not have had, thus creating a risk to persons on the roadways.
West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d at 551.
C.
According to Ms. Satterfield’s complaint, Alcoa’s employees worked with materials containing asbestos on a daily basis. Employees, including Mr. Satterfield, worked under improper and unsafe conditions which violated internal safety requirements and OSHA standards. As a result, the employees’ clothes collected significant amounts of asbestos fibers. Even though Alcoa was aware of the dangerous amounts of asbestos on its employees’ clothes, Alcoa did not inform its employees that the materials that they were handling contained asbestos or of the risks posed by asbestos fibers to the employees or to others. The danger was compounded even further because Alcoa dissuaded its employees from using on-site bathhouse facilities, and it failed to provide coveralls or to wash its employees’ work clothes at the factory. Under the facts alleged in Ms. Satterfield’s complaint, Alcoa’s alleged misfeasance created a significant risk of harm to Ms. Satterfield.
Despite Alcoa’s protestations to the contrary, this is not a failure to act ease wherein a defendant “declined to interfere, ... was in no way responsible for the perilous situation, ... did not increase the peril, ... took away nothing from the per *364 son in jeopardy, [but instead] ... simply failed to confer a benefit.”[30] The rules establishing no duty to protect, to rescue, or to control the conduct of third parties, the underlying basis of Alcoa's argument, are all subsets of the same no affirmative duty to act absent a special relationship rule.[31] That rule, however, is inapplicable to this case. Instead, this case involves a risk created through misfeasance. Rochon v. Saberhagen Holdings, Inc., 140 Wash. App. 1008, 2007 WL 2325214, at *3 & n. 23; see also In re Certified Question from Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 225 (Cavanagh, J., dissenting). Thus, as in Rochon v. Saberhagen Holdings, Inc., the outcome of this case does not turn on a failure to act or on the act of a third party, but instead, it turns on the employer’s own misfeasance — its injurious affirmative act of operating its facility in such an unsafe manner that dangerous asbestos fibers were transmitted outside the facility to others who came in regular and extended close contact with the asbestos-contaminated work clothes of its employees. Rochon v. Saberhagen Holdings, Inc., No. 58579-7-I, 2007 WL 2325214, at *3;[32] see also In re Certified Question from Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 225 (Cavanagh, J., dissenting).[33]
As illustrated by West v. East Tennessee Pioneer Oil Co., liability for misfeasance is not cabined within the confines of boxes created by particular relationships. To the contrary, “[liability for ‘misfeasance’ ... may extend to any person to whom harm may reasonably be anticipated as a result of the defendant’s conduct ...; while for ‘nonfeasance’ it is necessary to find some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act.” Prosser and Keeton § 56, at 374. Alcoa engaged in misfeasance that set in motion a risk of harm to Ms. Satter-field. Because Ms. Satterfield’s complaint rests on the basic tort claim of misfeasance, it is not necessary to analyze in detail whether Alcoa also had duties arising from special relationships with third parties.
IV.
Concluding that Ms. Satterfield’s complaint alleges that Alcoa’s misfeasance caused her to contract mesothelioma does not end the inquiry into whether Tennessee recognizes that Alcoa owed a duty to Ms. Satterfield based on the factual allegations in her complaint. Determinations regarding the existence and scope of a particular legal duty also reflect “society’s contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another’s act or conduct.” Bradshaw v. Daniel, 854 S.W.2d at 870. After ah, the concept of duty is largely an expression of policy considerations.[34] Accordingly, our consideration of the existence and scope of Alcoa’s duty must also include an *365 analysis of the relevant public policy considerations. Burroughs v. Magee, 118 S.W.3d at 329.
It would be erroneous, however, to assume that the concept of duty is a freef-loating application of public policy, drifting on the prevailing winds like the seeds of a dandelion. Like the courts in our sister states, Tennessee’s courts have not become so intoxicated on the liquor of public policy analysis that we have lost our appreciation for the moderating and sobering influences of the well-tested principles regarding the imposition of duty.[35]
A.
In most cases today, prior court decisions and statutes have already established the doctrines and rules governing a defendant’s conduct.[36] Generally, the presence or absence of a duty is a given rather than a matter of reasoned debate, discussion, or contention. The common law, however, must and does grow to accommodate new societal realities and values — or simply better reasoning — as it moves toward refinement and modification with the aim of improving while maintaining a sufficient stability so as to seek, and one hopes, to find, prudent reformation as opposed to anarchic revolution.
When the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable, courts will turn to public policy for guidance. Doing so necessarily favors imposing a duty of reasonable care where a “defendant’s conduct poses an unreasonable and foreseeable risk of harm to persons or property.” McCall v. Wilder, 913 S.W.2d at 153. When conducting this analysis, the courts have considered, among other factors: (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct. Burroughs v. Magee, 118 S.W.3d at 329; McCall v. Wilder, 913 S.W.2d at 153.
With these factors firmly in mind, Tennessee’s courts use a balancing approach to determine whether the particular risk should give rise to a duty of reasonable care. West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d at 551; Burroughs v. Magee, 118 S.W.3d at 329. A duty arises when the degree of foreseeability of the risk and the gravity of the harm outweigh the burden that would be imposed if the defendant were required to engage in an alternative course of conduct that would have prevented the harm. West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d at 551; Burroughs v. Magee, 118 S.W.3d at 329; McCall v. Wilder, 913 S.W.2d at 153. The foreseeability and gravity of the harm are linked insofar as the degree of foreseeability needed to establish a duty is inversely proportional to the magnitude of the foreseeable harm. Turner v. Jordan, 957 S.W.2d at 818. The greater the risk of *366 harm, the less degree of foreseeability is required. Pittman v. Upjohn Co., 890 S.W.2d 425, 433 (Tenn.1994). During the balancing process, it is permissible for the courts to consider the contemporary values of Tennessee’s citizens.[37]
"While every balancing factor is significant, the foreseeability factor has taken on paramount importance in Tennessee. Hale v. Ostrow, 166 S.W.3d 713, 716-17 (Tenn.2005); Biscan v. Brown, 160 S.W.3d at 480. This factor is so important that if an injury could not have been reasonably foreseen, a duty does not arise even if causation-in-fact has been established. Doe v. Linder Constr. Co., 845 S.W.2d 173, 178 (Tenn.1992).[38] Conversely, foreseeability alone is insufficient to create a duty. McClung v. Delta Square Ltd. P’ship, 937 S.W.2d 891, 904 (Tenn.1996). Thus, to prevail on a negligence claim, a plaintiff must show that the risk was foreseeable, but that showing is not, in and of itself, sufficient to create a duty. Instead, if a risk is foreseeable, courts then undertake the balancing analysis.
While there have certainly been able and skillful critiques of the role that foreseeability plays in determining whether a duty exists,[39] the majority of courts continue to use foreseeability as a central component of their analyses.[40] Foreseeability has proven to be a useful hub from which central organizing principles can be maintained, while at the same time allowing for prudent modification and reformation of those principles. Despite the difficulties and significant stumbles, the experience of most courts has been that maintaining a role for foreseeability when addressing questions regarding the existence and scope of duty assists — more than it impedes — the application and development of the law of negligence.
The role that the concept of foreseeability plays in the context of a court’s determination of the existence and scope of a duty differs from the role the concept plays when the fact-finder is addressing proximate causation.[41] For a duty to exist, the defendant’s “conduct *367 must create a recognizable risk of harm to the [plaintiff] individually, or to a class of persons — as, for example, all persons within a given area of danger — of which the [plaintiff] is a member.” Restatement (Second) of Torts § 281 cmt. c, at 4-5. However, because almost any outcome is possible and can be foreseen, the mere fact that a particular outcome might be conceivable is not sufficient to give rise to a duty. For the purpose of determining whether a duty exists, the courts’ consideration of foreseeability is limited to assessing whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it.[42] In this context, the courts are not concerned with the ultimate reasonableness, or lack of reasonableness, of the defendant’s conduct. Rather, the courts are simply ascertaining “whether [the] defendant was obligated to be vigilant of a certain sort of harm to the plaintiff.” [43]
B.
Viewing the allegations in Ms. Satterfield’s complaint in the light most favorable to her, it is not difficult to conclude that Ms. Satterfield falls within a class of persons that could, with reasonable foreseeability, be harmed by exposure to asbestos. That class includes persons who regularly and for extended periods of time came into close contact with the asbestos-contaminated work clothes of Alcoa’s employees.
Under the facts alleged in Ms. Satter-field’s complaint, Alcoa was aware of the presence of significant quantities of asbestos fibers on its employees’ work clothes. It was also aware of the dangers posed by even small quantities of asbestos and that asbestos fibers were being transmitted by its employees to others. Nevertheless, despite its extensive and superior knowledge of the dangers of asbestos, Alcoa allegedly (1) failed to inform its employees that they were working with materials containing asbestos; (2) failed to provide its employees with or to require them to wear protective covering on their clothes; (3) actively discouraged its employees’ use of on-site bathhouse facilities for changing or cleaning; and (4) failed to inform its employees of the dangers posed by the asbestos fibers on their work clothes. Under these circumstances, it was foreseeable that Ms. Satterfield would come into close contact with Mr. Satterfield’s work clothes on an extended and repeated basis.
C.
Because the risk of Ms. Satter-field being exposed to the asbestos fibers on her father’s work clothes was foreseeable, the analysis shifts to considering the balancing factors: (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with the safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct. Burroughs v. Magee, 118 S.W.3d at 329; McCall v. Wilder, 913 S.W.2d at 153.
When considering these factors, courts should take care not to invade *368 the province of the jury.[44] A court’s function is more limited than a jury’s. As a practical matter, a court serves as a gatekeeper and may exclude a claim only if it finds, as a matter of law, that the defendant does not owe a duty to the plaintiff.[45] For claims that-should not be excluded as a matter of law, it is ultimately the jury’s function to determine whether the defendant actually breached its duty of reasonable care.
While the facts alleged in Ms. Satter-field’s complaint may not permit a precise assessment of the full extent of the risk to Ms. Satterfield, they certainly support a conclusion that the risk to her was real and substantial. In light of the debilitating and fatal illnesses that can be caused by exposure to asbestos fibers,[46] the magnitude of the potential harm to Ms. Satter-field was great.
Alcoa argues that its manufacturing operations create jobs and provide useful products and that recognizing that it owes a duty to persons like Ms. Satterfield will have an adverse impact on its ability to provide jobs and to produce useful products. This assertion warrants serious consideration. However, at least at this stage of the proceeding, Alcoa has not articulated a connection between its allegedly negligent acts and its ability to provide employment or to produce useful products. For example, it has not demonstrated that the sort of exposure to asbestos that is involved in this case is a largely unavoidable part of its manufacturing operations.
Ms. Satterfield’s complaint, on the other hand, asserts that Alcoa could have greatly reduced the risk of asbestos exposure. It asserts that her risk of being exposed to the asbestos on her father’s work clothes could have been greatly reduced had Alcoa (1) provided basic warnings to its employees about the dangers of asbestos, (2) required safer handling of the materials containing asbestos, (3) provided coveralls to its employees, (4) required employees to change their clothes before leaving the workplace, (5) laundered its employees’ work clothes on site, or (6) encouraged its employees to use the on-site bathhouse facilities before leaving work.
Based on the present record, many of the measures described in Ms. Satterfield’s complaint to protect workers and their families from exposure to asbestos appear to be feasible and efficacious without imposing prohibitive costs or burdens on Alcoa.[47] For its part, however, Alcoa has *369 offered no explanation why any or all of these precautions were not feasible or how they would have had a deleterious effect on its ability to provide jobs or to produce useful products.
Based on the facts alleged in Ms. Satter-field’s complaint, Alcoa was a knowledgeable and sophisticated company that was fully aware (1) that it used materials containing asbestos in its manufacturing operations, (2) that high volumes of asbestos fibers were being deposited on its employees’ work clothes, and (3) that exposure to asbestos fibers created a substantial health risk. In light of this knowledge, Alcoa had a duty to use reasonable care to prevent exposure to asbestos fibers not only to its employees but also to those who came into close regular contact with its employees’ contaminated work clothes over an extended period of time.
V.
Alcoa articulates additional reasons for declining to hold that it has a duty to persons like Ms. Satterfield. First, it argues that the current asbestos litigation crisis in the United States will be worsened if employers that have utilized asbestos in manufacturing are exposed to additional costly litigation. Second, Alcoa asserts that manufacturers could face bankruptcy and a substantial loss of jobs could result if they are exposed to the burden of additional liability. Third, Alcoa claims that finding that it has a duty to persons like Ms. Satterfield will expose premises owners to a host of similar claims by other plaintiffs.
A.
There can be little doubt that there is an asbestos products liability litigation crisis in the United States.[48] The United States Supreme Court has noted that the “elephantine mass of asbestos cases ... defies customary judicial administration and calls for national legislation.” Ortiz v. Fibreboard Corp., 527 U.S. 815, 821, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). While calls for legislative action have produced much debate and have resulted in various remedial proposals, this sound and fury has not resulted in any significant national legislation.[49]
Unimpaired claimants stand at the center of the asbestos exposure litigation crisis.[50] Estimates compiled in surveys funded by asbestos defendants suggest that between sixty-six and ninety percent of claimants are unimpaired.[51] These claim *370 ants are persons who have been exposed to asbestos and who usually have some marker of exposure, but who are not impaired by an asbestos-related disease and likely never will be.[52] The enormous number of claims that have been filed by unimpaired or mildly impaired persons was unexpected.[53] As a result of these claims, the funds available to compensate persons gravely affected by exposure to asbestos has been depleted,[54] and the persons with more serious illnesses caused by exposure to asbestos have been “lost in the shuffle.”[55]
Alcoa’s argument that liability should be foreclosed as a matter of law because of the current asbestos litigation crisis might have resonance with regard to recognizing a duty to unimpaired claimants where the magnitude of the harm is significantly less. However, it rings hollow with regard to a claimant, like Ms. Satterfield, who has died of mesothelioma.
The various efforts to reform asbestos litigation have been directed toward stemming the tide of lawsuits in large part to ensure that seriously ill claimants are able to recover and are not drowned out by unimpaired claimants.[56] Victims of meso-thelioma are regularly identified as precisely the type of claimants whose claims should be protected.[57] It is not surprising that individuals with mesothelioma are put in such a category because mesothelioma is a serious and fatal illness that rarely occurs in the general population and that is closely associated with exposure to asbestos.[58] Ms. Satterfield is precisely the type of claimant whose claims should be permitted rather than inhibited.
B.
Alcoa also contends that it does not manufacture asbestos and that the *371 manufacturers who use materials containing asbestos in their manufacturing process will face enormous financial burdens if they are exposed to liability for illnesses caused by exposure to asbestos fibers in their manufacturing processes. We find this argument unpersuasive. If the financial burden of compensating these injuries is lifted from the employers’ shoulders, it does not vanish into the ether. Rather, the burden will fall on persons like Ms. Satterfield. We see no particular public policy reason to favor imposing these costs upon the persons who have been harmed by exposure to asbestos rather than upon the manufacturers who used asbestos in their manufacturing processes. Furthermore, based on the facts alleged in Ms. Satterfield’s complaint, Alcoa is far from an uninformed manufacturer who had the misfortune of using materials containing asbestos in its manufacturing process.
C.
Alcoa also asserts that if it is found to be liable to persons like Ms. Satterfield, all premises owners, including schools and home owners, will be exposed to liability for asbestos exposure to persons who were never on their premises. This concern is misplaced for two reasons. First, this opinion is not addressed to premises liability law but rather to the law applicable in a general negligence misfeasance case. See Rochon v. Saberhagen Holdings, Inc., 140 Wash.App. 1008, 2007 WL 2325214, at *2-5. Second, viewing the facts in the light most favorable to Ms. Satterfield, Alcoa is a sophisticated manufacturer that was aware of, or should have been aware of, the risk to others that could result from exposure to asbestos fibers. Under the facts alleged in the complaint, Alcoa knew its employees’ work clothes contained significant quantities of asbestos fibers, and it understood the danger of transmitting these asbestos fibers to others. It is not readily apparent, though the facts of a future case may warrant a contrary finding, that such a transmission injury would be reasonably foreseeable by school officials or home owners.
D.
Finally, Alcoa argues that this Court should not recognize the existence of a duty to persons like Ms. Satterfield because doing so would be “contrary to the emerging weight of authority in the United States.” As an initial matter, it is not entirely clear that the various decisions of courts in other states reflect a clear weight of authority standing behind the rejection of finding that employers have a duty in take-home or transmission asbestos exposure cases. Courts in Louisiana,[59] New Jersey,[60] California,[61] and Washington[62] have recognized the existence of a duty under circumstances similar to the present case. A Texas state court[63] and a United States District Court in Kentucky,[64] sitting in diversity jurisdiction, did not foreclose the imposition of a duty in take-home exposure cases but instead found that the injuries in the respective cases were not *372 foreseeable because they were caused before the defendants were aware of the dangers of asbestos transmission beyond the workplace.[65] Courts in Georgia,[66] Maryland,[67] Michigan,[68] New York,[69] and Delaware[70] have concluded that no duty exists. Rather than confirming the existence of an “emerging weight of authority” supporting Alcoa’s position, our research reveals a pronounced split of authority with regard to the central issue of this case.
Furthermore, the distinctions that have been drawn and the explanations that have been offered by the courts refusing to recognize a duty similar to the one we recognize today, if anything, bolster our conclusion that the cases relied upon by Alcoa do not provide helpful guidance to us. For example, in In re New York City Asbestos Litigation, the Court of Appeals of New York distinguished an opinion by the New Jersey Supreme Court finding that a duty existed on the ground that
New Jersey, unlike New York, relies heavily on foreseeability in its duty analysis. Moreover, Olivo can be distinguished factually in that the landowner did nothing to prevent workers from bringing asbestos-covered clothing into the family home-an important component of that court’s duty analysis-whereas here, the Port Authority provided laundry services to [the employee], which is relevant under New York law as to whether the Port Authority breached any duty that it may have owed [the plaintiff family member].
In re New York City Asbestos Litig., 806 N.Y.S.2d 146, 840 N.E.2d at 122. However, like the courts in New Jersey,[71] and *373 unlike the courts in New York, Tennessee’s courts rely heavily on foreseeability when determining the existence and scope of a duty. Hale v. Ostrow, 166 S.W.3d at 716-17; Biscan v. Brown, 160 S.W.3d at 480. In addition, the facts in the In re New York City Asbestos Litigation case regarding the conduct of the employee differ significantly from the factual allegations in Ms. Satterfield’s complaint.[72]
Similarly, the decisions by the courts in Delaware,[73] Georgia,[74] Maryland,[75] and Michigan[76] emphasize the absence of a relationship or a special relationship between the plaintiff and the defendant. We have already concluded that, under the law of Tennessee, the existence or the nature of a relationship between the plaintiff and the defendant is not controlling with regard to claims based on negligent misfeasance. The decisions by the courts in Texas and Kentucky appear to hinge on the fact that the asbestos exposure occurred before the type of take-home or transmission exposure injury that is involved in this case was reasonably foreseeable.
Based on our review of the opinions of the courts in other states addressing the issue before us in this case, we are not persuaded that the weight of authority supports Alcoa in this case. While we have the greatest respect for the courts that have declined to recognize the duty we recognize today, we have determined that their decisions rest on negligence principles that are not consistent with ours or that they arise from facts that are significantly dissimilar from the factual allegations in Ms. Satterfield’s complaint.
VI.
Both Alcoa and Mr. Satterfield address the proper scope of the class of persons to whom a duty is owed in cases of this sort. The Court of Appeals limited Alcoa’s duty “to members of employees’ households who routinely come into close contact with employees’ contaminated clothing over an extended period of time.”[77] In addition, it expressly excluded “individuals who might possibly come into contact with the employees’ clothing, but whose contacts are sporadic or unpredictable.”[78]
Even though the cases that have recognized the duty we recognize today have involved claims by an employee’s family *374 members,[79] they have not necessarily rejected claims by other plaintiffs. In support of its argument against recognizing any duty in cases like this one, Alcoa asserts that no principled basis exists to limit the duty to the members of the employee’s immediate family living in the employees house and thus that recognizing a duty to these family members will eventually result in the recognition of a duty with regard to babysitters, housekeepers, home repair contractors, and next-door neighbors. Alcoa makes a valid point with regard to restricting the duty to family members.
There is no magic talisman that protects persons from the harmful effects of exposure to asbestos simply because they do not live under the same roof or are not a member of the employee’s family by blood or marriage. It is foreseeable that the adverse effects of repeated, regular, and extended exposure to asbestos on an employee’s work clothes could injure these persons. Public policy does not warrant finding that there is no duty owed to such persons. Accordingly, the duty we recognize today extends to those who regularly and repeatedly come into close contact with an employee’s contaminated work clothes over an extended period of time, regardless of whether they live in the employee’s home or are a family member.
We note that the Michigan Supreme Court has cautioned that allowing liability in cases like this one could result in “mass tort actions brought by remotely exposed persons such as extended family members, renters, house guests, carpool members, bus drivers, and workers at commercial enterprises visited by the worker when he or she was wearing dirty work clothes.” In re Certified Question from Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 219. However, in light of the magnitude of the potential harm from exposure to asbestos and the means available to prevent or reduce this harm, we see no reason to prevent carpool members, babysitters, or the domestic help from pursuing negligence claims against an employer should they develop mesothelioma after being repeatedly and regularly in close contact with an employee’s asbestos-contaminated work clothes over an extended period of time.[80]
We also note the Delaware Superior Court’s concern regarding the potentially limitless liability that could arise from requiring employers to undertake to warn or otherwise protect every potentially foreseeable victim of off-premises exposure to asbestos. In re Asbestos Litig., 2007 WL 4571196, at *12. We agree that a duty to warn all foreseeable persons who might be exposed to asbestos fibers on an employee’s work clothes would be too great a burden. However, the imposition of a duty of reasonable care with regard to safe handling of asbestos fibers on employees’ work clothes to prevent transmission to others is not such a burden.
Recognizing the existence of a duty to exercise reasonable care to avoid the risk of harm to another involves considerations of fairness and public policy. Under Tennessee law, Alcoa has a duty to *375 prevent foreseeable injury from an unreasonable risk of harm that it had itself created. Under the facts alleged in Ms. Satterfield’s complaint, Alcoa failed to inform its employees, including Mr. Satter-field, of the risks associated with asbestos and failed to provide them with meaningful alternatives to wearing home their contaminated work clothes. Based on these allegations, Alcoa created a risk that persons who came into close and regular contact over an extended period of time with its employees’ work clothes would be exposed to the asbestos fibers on the clothes. The fair and proportional duty we recognize today is neither limitless nor impractical.
VII.
We have determined that Ms. Satter-field’s complaint states a claim upon which relief can be granted. Accordingly, the trial court erred by granting Alcoa a judgment on the pleadings, and the Court of Appeals correctly reversed that order. Based on the facts in Ms. Satterfield’s complaint, we cannot conclude, as a matter of law, that Alcoa did not owe a duty to Ms. Satterfield. Our ruling does not foreclose the possibility that Ms. Satterfield’s estate will not be able to present sufficient evidence to support her claim. Thus, Alcoa is certainly free to challenge any element of Ms. Satterfield’s claim via a motion for summary judgment or motion for directed verdict. Accordingly, we affirm the Court of Appeals and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to Alcoa, Inc. for which execution, if necessary, may issue.
JANICE M. HOLDER, J., filed a separate concurring and dissenting opinion.

. When a complaint has been dismissed in response to a Tenn. R. Civ. P. 12.03 motion, we must construe the complaint liberally in the plaintiff's favor by taking all factual allegations in the complaint as true and by giving the plaintiff the benefit of all the inferences that can be reasonably drawn from the pleaded facts. Lanier v. Rains, 229 S.W.3d 656, 660 (Tenn.2007); Cherokee Country Club, Inc. v. City of Knoxville, 152 S.W.3d 466, 470 (Tenn.2004). In this case, we are doing nothing more than reviewing the pleaded facts through the perceptual lenses worn by reviewing courts when asked to determine whether a Tenn. R. Civ. P. 12.03 motion should have been granted.

. The Aluminum Company of America changed its name to Alcoa, Inc. in 1999. The complaint named “Aluminum Company of America (Alcoa, Inc.)” as the defendant. We will refer to the company as "Alcoa” in this opinion.

. Ms. Satterfield alleged in her complaint that Alcoa was aware that asbestos was a known *354 human carcinogen and that, as early as the 1960s, Alcoa was also aware that persons with light intermittent exposure to asbestos were at a higher risk of contracting mesothe-lioma. See also National Cancer Institute, Fact Sheet, Asbestos Exposure: Questions and Answers, http://www.cancer.gov/cancertopics/ factsheet/Risk/asbestos (last visited Aug. 5, 2008) ("Studies have shown that exposure to asbestos may increase the risk of lung cancer and mesothelioma (a relatively rare cancer of the thin membranes that line the chest and abdomen). Although rare, mesothelioma is the most common form of cancer associated with asbestos exposure.”).

. In order to avoid misunderstanding, we will refer to the complaint as "Ms. Satterfield’s complaint” even though her father was substituted as the plaintiff following her death. The following discussion of Alcoa’s duty relates to the duty it owed to Ms. Satterfield, not to Mr. Satterfield.

. Francis H. Bohlen, The Moral Duty to Aid Others as a Basis of Tort Liability, 56 U. Pa. L.Rev. 217, 219 (1908).

. Tennessee's courts have recognized and accredited this analysis of the distinction between misfeasance and nonfeasance. See, e.g., Bradshaw v. Daniel, 854 S.W.2d at 870; Newton v. Tinsley, 970 S.W.2d 490, 492 (Tenn.Ct.App.1997).

. This Court has previously relied upon Professor Harper’s and Judge Kime’s explanation. Bradshaw v. Daniel, 854 S.W.2d at 871.

. Restatement (Third) of Torts: Liab. Physical Harm § 37, Reporter's Note, cmt. c, at 721 *357 (Proposed Final Draft No. 1, 2005) [hereinafter "Restatement (Third) of Torts”].

. John C.P. Goldberg & Benjamin C. Zipur-sky, The Restatement (Third) and the Place of Duty in Negligence Law, 54 Vand. L.Rev. 657, 691 (2001) [hereinafter "Goldberg & Zipur-sky”].

. Restatement (Third) of Torts § 37 cmt. c, at 711.

. Restatement (Third) of Torts § 37 cmt. c, at 712.

. See, e.g., John M. Adler, Relying Upon the Reasonableness of Strangers: Some Observations About the Cmrent State of Common Law Affirmative Duties to Aid or Protect Others, 1991 Wis. L.Rev. 867 (1991); James Barr Ames, Law and Morals, 22 Harv. L.Rev. 97 (1908) [hereinafter "Ames”]; Thomas C. Gal-ligan, Jr., Aiding and Altruism: A Mythopsy-cholegal Analysis, 27 U. Mich. J.L. Reform 439 (1994); Steven J. Heyman, Foundations of the Duty to Rescue, 47 Vand. L.Rev. 673 (1994) [hereinafter "Heyman”]; Jay Silver, The Duty to Rescue: A Reexamination and Proposal, 26 Wm. & Mary L.Rev. 423 (1985); Ernest J. Weinrib, The Case for a Duty to Rescue, 90 Yale L.J. 247 (1980) [hereinafter “Weinrib”].

. Weinrib, 90 Yale L.J. at 260. See also Heyman, 47 Vand. L.Rev. at 741 ("Perhaps the most common argument for a duty to rescue is based on the view that individuals have a moral obligation to aid others.”).

. Richard A. Epstein, A Theory of Strict Liability, 2 J. Legal Stud. 151, 201 (1973) [hereinafter "Epstein"].

. Professor Epstein has explained that
[o]nce one decides that as a matter of statutory or common law duty, an individual is required under some circumstances to act at his own cost for the exclusive benefit of another, then it is very hard to set out in a principled manner the limits of social interference with individual liberty.... Even if the rule starts out with ... modest ambitions, it is difficult to confine it to those limits. Take a simple case first. X as a representative of a private charity asks you for $10 in order to save the life of some starving child in a country ravaged by war. There are other donors available but the number of needy children exceeds that number. The money means "nothing” to you. Are you under a legal obligation to give the $10? Or to lend it interest-free?
Epstein, 2 J. Legal Stud, at 198-99.
Lord Macaulay made the same point in his discussion of The Indian Penal Code when he remarked:
We are sensible that in some of the cases which we have put our rule may appear to be too lenient. But we do not think that it can be made more severe, without disturbing the whole order of society. It is true that the man who, having abundance of wealth, suffers a fellow creature to die of hunger at his feet, is a bad man, — a worse man, probably, than many of those for whom we have provided very severe punishment. But we are unable to see where, if we make such a man legally punishable, we can draw the line. If the rich man who refuses to save the beggar’s life at the cost of a little copper is a murderer, is the poor man just one degree above beggary also to be a murderer if he omits to invite the beggar to partake his hard earned rice? Again: If the rich man is a murderer for refusing to save the beggar's life at the cost of a little copper, is he also to be a murderer if he refuses to save the beggar's life at the cost of a thousand rupees? ... It will hardly be maintained that a surgeon ought to be treated as a murderer for refusing to go from Calcutta to Meerut to perform an operation, although it should be absolutely certain that this surgeon was the only person in India who could perform it, and that if it were not performed, the person who required it would die.
Thomas B. Macaulay, Report Upon the Indian Penal Code, in 7 Works of Lord Macaulay 493-94 (H. Trevelyan ed., 1866) (quoted in Jeremy Waldron, On the Road: Good Samaritans and Compelling Duties, 40 Santa Clara L.Rev. 1053, 1069 n. 45 (2000)).

.Alan Calnan, The Fault(s) in Negligence Law, 25 Quinnipiac L.Rev. 695, 722-23 (2007).

. Damien Schiff, Samaritans: Good, Bad and Ugly: A Comparative Law Analysis, 11 Roger Williams U.L.Rev. 77, 126 (2005). Furthermore,
[no one truly] believes that everything that is immoral-not even everything that can be generally agreed to be immoral-should be illegal, and a central task for a legal theory will be to say how to draw that line. In constructing a legal account ..., the legal theorist must take into account our interest in personal freedom, our interest in not harming ourselves or others, and many other highly complex factors. Many of these will be moral factors, involving the weighing of harms, rights and liberties, and so forth.
Martha Nussbaum, “Only Grey Matter"? Richard Posner’s Cost-Benefit Analysis of Sex, 59 U. Chi. L.Rev. 1689, 1699 (1992).

. Note, Professional Obligation and the Duty to Rescue: When Must a Psychiatrist Protect His Patient’s Intended Victim?, 91 Yale L.J. 1430, 1433 n. 20 (1982) (citing William God-win, Enquiry Concerning Political Justice and Its Influence on General Virtue and Happiness 165-327 (Isaac Krammick ed., 1976) (1793)).

. Theodore M. Benditt, Liability for Failing to Rescue, 1 Law & Phil. 391, 410 (1982).

. More than one century ago, the Kansas Supreme Court observed:
It is the omission or negligent discharge of legal duties only which come within the sphere of judicial cognizance. For withholding relief from the suffering, for failure to respond to the calls of worthy charity, or for faltering in the bestowment of brotherly love on the unfortunate, penalties are found not in the laws of men, but in that higher law, the violation of which is condemned by the voice of conscience, whose sentence of punishment for the recreant act is swift and sure.
Union Pac. Ry. v. Cappier, 66 Kan. 649, 72 P. 281, 282 (1903); but see Harold F. McNiece & John V. Thornton, Affirmative Duties in Tort, 58 Yale LJ. 1272, 1280 n. 52 (1949).

. James A. Henderson, Jr., Process Constraints in Tort, 67 Cornell L.Rev. 901, 943 (1982) [hereinafter "Henderson”].

. Tennessee's courts are neither the first nor the only courts to recognize exceptions to the no duty to act or to rescue rule. Academics have noted that "Eighteenth-[C]entury courts carved out exceptions to the no duty rule based upon the higher duties 'owed by sur *360 geons, apothecaries, solicitors, and innkeepers' ” as well as by common carriers. Michael L. Rustad & Thomas H. Koenig, Taming the Tort Monster: The American Civil Justice System as a Battleground of Social Theory, 68 Brook. L.Rev. 1, 42 (2002) [hereinafter "Rus-tad & Koenig”]; see also Ames, 22 Harv. L.Rev. at 111-12 (excluding from the discussion of the propriety of the no duty to act or to rescue rule “cases in which, by reason of some relation between the parties like that of father and child, nurse and invalid, master and servant and others, there is a recognized legal duty to act.”).

. “Courts can create guidelines based on the customary patterns of behavior associated with each relationship.” Henderson, 67 Cornell L.Rev. at 940 n. 187.

. Rustad & Koenig, 68 Brook. L.Rev. at 42; see also Tarasoff v. Regents ofUniv. of Cal., 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 343 n. 5 (1976) (stating that "the courts have increased the number of instances in which affirmative duties are imposed not by direct rejection of the common law [no duty to rescue] rule, but by expanding the list of special relationships which will justify departure from that rule”). Tennessee courts have been particularly vigilant with regard to the imposition of affirmative duties in the context of medical treatment relationships. See Limbaugh v. Coffee Med. Ctr., 59 S.W.3d 73, 79-80 (Tenn.2001).

. See Phillip G. Peters, Jr., Rethinking Wrongful Life: Bridging the Boundary Between Tort and Family Law, 67 Tul. L.Rev. 397, 431 (1992); Lisa E. Heinzerling, Comment, Actionable Inaction: Section 1983 Liability for Failure to Act, 53 U. Chi. L.Rev. 1048, 1063 n. 82 (1986); see generally Irwin v. Town of Ware, 392 Mass. 745, 467 N.E.2d 1292, 1300 (1984) (asserting that the nature of the relationships are such that imposition of a duty is foreseeable); John M. Adler, Relying Upon the Reasonableness of Strangers: Some Observations About the Current State of Common Law Affirmative Duties to Aid or Protect Others, 1991 Wis. L.Rev. 867, 886-98 (critiquing the special relationship exception in advocating for a general duty to act or rescue); Victor E. Schwartz & Leah Lorber, Defining the Duty of Religious Institutions to Protect Others: Surgical Instruments, Not Machetes, Are Required, 74 U. Cin. L.Rev. 11, 24-26 (2005) (describing the special relationship exception and categories thereof).

. Harper & Kime, 43 Yale L.J. at 887.

. Tennessee law provides that a duty of reasonable care may arise through gratuitous assumption. Bennett v. Trevecca Nazarene Univ., 216 S.W.3d 293, 300 (Tenn.2007); Biscan v. Brown, 160 S.W.3d at 482-83; Ridley v. Mobile & O.R. Co., 114 Tenn. 727, 738, 86 S.W. 606, 609 (1905); Nidiffer v. Clinchfield R.R., 600 S.W.2d 242, 246 (Tenn.Ct.App.1980).

. Reiterating the same general point, the Restatement (Second) of Torts also provides that
[i]n general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty.
Restatement (Second) of Torts § 302 cmt. a, at 82.

.See Martin v. Gen. Elec. Co., No. 02-201-DLB, 2007 WL 2682064, at *5 (E.D.Ky. Sept.5, 2007) (noting that "[c]ourts across the country have significantly disagreed on the extension of liability in household asbestos exposure cases and have frequently reached opposite conclusions based on each state’s law and how the law defines a legal duty.”).

. Ames, 22 Harv. L.Rev. at 112.

. See Kathleen Connolly Butler, Shared Responsibility: The Duty to Legal Extems, 106 W. Va. L.Rev. 51, 63 (2003).

. In making this argument, which was ultimately adopted by the Washington Court of Appeals, the employee in Rochon drew upon the well-reasoned and articulated opinion of the Court of Appeals in the present case as authored by Judge Franks.

. Our reference to Justice Cavanagh's dissent is based upon a shared view that these "take-home” or "transmission” asbestos exposure cases turn upon questions of general negligence rather than third-party or premises liability.

. Prosser and Keeton, § 53, at 358.

. See generally John C.P. Goldberg & Benjamin C. Zipursky, The Moral of Macpherson, 146 U. Pa. L.Rev. 1733, 1772-75 (1998). These rules themselves are derived not purely from logic, as if some formalist absolute was given birth, but from the collective wisdom and application of common-law courts in which public policy has certainly played an important role.

. Leon Green, The Causal Relation Issue in Negligence Law, 60 Mich. L.Rev. 543, 562-63 (1962).

. William L. Prosser, Palsgraf Revisited, 52 Mich. L.Rev. 1, 15 (1953) (quoting Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99, 104 (1928) (Andrews, J., dissenting)); see also Taco Bell, Inc. v. Lannon, 744 P.2d 43, 46 (Colo.1987) (stating that "the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards-whether reasonable persons would recognize a duty and agree that it exists”).

. Oliver Wendell Holmes justified the foreseeability requirement as follows: "The requirement of an act is the requirement that the defendant should have made a choice. But the only possible purpose of introducing this moral element is to make the power of avoiding the evil complained of a condition of liability. There is no such power where the evil cannot be foreseen.” Oliver Wendell Holmes, The Common Law 77 (Mark DeWolfe Howe ed., Little Brown & Co.1963) (1881).

. See, e.g., W. Jonathan Cardi, Purging Foreseeability, 58 Vand. L.Rev. 739 (2005).

. James R. Adams, From Babel to Reason: An Examination of the Duty Issue, 31 McGeorge L.Rev. 25, 46 (1999); W. Jonathan Cardi, Reconstructing Foreseeability, 46 B.C. L.Rev. 921, 923 (2005).

. See, e.g., McCain v. Fla. Power Corp., 593 So.2d 500, 502-04 (Fla.1992); Di Cosala v. Kay, 91 N.J. 159, 450 A.2d 508, 516 (1982); Bodkin v. 5401 S.P., Inc., 329 Ill.App.3d 620, 263 Ill.Dec. 434, 768 N.E.2d 194, 203 (2002) (quoting Colonial Inn Motor Lodge, Inc. v. Gay, 288 Ill.App.3d 32, 223 Ill.Dec. 674, 680 N.E.2d 407, 413 (1997)); Knoll v. Bd. of Regents of Univ. of Neb., 258 Neb. 1, 601 N.W.2d 757, 763 (1999); Mack v. Altmans Stage Lighting Co., 98 A.D.2d 468, 470 N.Y.S.2d 664, 667 (N.Y.App.Div.1984); Goldberg & Zipursky, 54 Vand. L.Rev. at 728 (noting that "[a]lthough foreseeability is invoked in both instances, the questions being asked are quite different.").

. See Lopez v. Three Rivers Elec. Coop., Inc., 26 S.W.3d 151, 156 (Mo.2000); Knoll v. Bd. of Regents of Univ. of Neb., 601 N.W.2d at 762-64.

. Goldberg & Zipursky, 54 Vand. L.Rev. at 728-29.

. See Burroughs v. Magee, 118 S.W.3d at 339 (Holder, J., concurring and dissenting).

. The determination of whether a complaint should be dismissed because the defendant did not owe a duty to the plaintiff must be made using the analysis required by the procedural posture of the case. Thus, when a claim is challenged by a Tenn. R. Civ. P. 12.03 or 12.02(6) motion, as in this case, the court must determine, based on the facts alleged in the complaint, whether the defendant owes a duty to the plaintiff. When a claim is challenged by a Tenn. R. Civ. P. 56 motion, the court must determine, based on the undisputed facts, whether the defendant owes a duty to the plaintiff. Finally, when a claim is challenged by a Tenn. R. Civ. P. 50 motion, the court must determine whether the only conclusion that a reasonable person can draw from the evidence is that the defendant did not owe a duty to the plaintiff.

. Even though the Michigan Supreme Court ultimately declined to hold that an employer owed a duty to its employees’ family members who were exposed to asbestos fibers on its employees’ clothes, it conceded that the nature of the risk was serious enough to impose a duty. In re Certified Question from Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 111.

. Alcoa argues that “a business today cannot guard against claims of liability for exposures that may have occurred half a century ago.” While it is undoubtedly true that an employer can do nothing to prevent an exposure that *369 occurred fifty years ago, the argument misses the mark with regard to our consideration of whether it owed a duty to persons who were repeatedly exposed to asbestos fibers on its employees’ clothing for an extended period. The inquiry into the feasibility, usefulness, cost, and burden of safer conduct relates to the time when the employer’s allegedly negligent conduct took place.

. See generally, e.g., Paul D. Carrington, Asbestos Lessons: The Consequences of Asbestos Litigation, 26 Rev. Litig. 583, 584-95 (2007).

. Douglas G. Smith, Resolution of Mass Tort Claims in the Bankruptcy System, 41 U.C. Davis L.Rev. 1613, 1632-34 (2008).

. Lester Brickman, On the Theory Class’s Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality, 31 Pepp. L.Rev. 33, 59 (2003).

. Stephen J. Carroll et al., Asbestos Litigation Costs and Compensation 20 (2002), available at http://www.rand.org/pubs/ documented_briefings/DB397/DB397.pdf (last visited July 5, 2008); see also Victor E. Schwartz et al., A Letter to the Nation’s Trial Judges: Serious Asbestos Cases How to Protect Cancer Claimants and Wisely Manage Assets, 30 Am. J. Trial Advoc. 295, 297 & n. 9 (2006); Katherine M. Anand, Note, Demanding Due Process: The Constitutionality of the § 524 Channeling Injunction and Trust Mechanisms That Effectively Discharge Asbestos Claims in *370 Chapter 11 Reorganization, 80 Notre Dame L.Rev. 1187, 1212 & n. 143 (2005).

. Mark A. Behrens & Monica G. Parham, Stewardship for the Sick: Preserving Assets for Asbestos Victims Through Inactive Docket Programs, 33 Tex. Tech L.Rev, 1, 5 (2001) (quoting The Fairness in Asbestos Compensation Act of 1999: Hearings Before the House Comm, on the Judiciary, 106th Cong. 5 (1999) (testimony of Prof. Christopher Edley, Jr.)); see generally Mark H. Reeves, Note, Makes Sense to Me: How Moderate, Targeted Federal Tort Reform Legislation Could Solve the Nation’s Asbestos Litigation Crisis, 56 Vand. L.Rev. 1949, 1961-64 (2003) (discussing the original rationale for suits involving unimpaired plaintiffs and the problems therewith).

. Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 Baylor L.Rev. 331, 342 (2002) [hereinafter ''Behrens”].

. Lester Brickman, An Analysis of the Financial Impact of S. 852: The Fairness in Asbestos Injury Resolution Act of2005, 27 Cardozo L.Rev. 991, 995 (2005).

. In re Asbestos Products Liability Litigation (No. VI), Civ. A. No. MDL 875, 1996 WL 539589, at *1 (E.D.Pa. Sept. 16, 1996); see also Steven B. Hantler et al., Is the “Crisis” in the Civil lustice System Real or Imagined?, 38 Loy. L.A. L.Rev. 1121, 1163-64 (2005); 28 No. 22 Andrews Asbestos Litig. Rep. 11 (2006).

. See, e.g., Behrens, 54 Baylor L.Rev. at 336, 344-57; Mark A. Behrens & Phil Goldberg, The Asbestos Litigation Crisis: The Tide Appears to be Turning, 12 Conn. Ins. L.J. 477, 488-95 (2005-06); Paul F. Rothstein, What Courts Can Do in the Face of the Never-Ending Asbestos Crisis, 71 Miss. L.J. 1, 10-14 (2001) [hereinafter "Rothstein”].

. See, e.g., Behrens, 54 Baylor L.Rev. at 344; Rothstein, 71 Miss. L.J. at 11-12.

. See, e.g., Jamie A. Grodsky, Genomics and Toxic Torts: Dismantling the Risk-Injury Divide, 59 Stan. L.Rev. 1671, 1730-31 & n. 240-41 (2007); Patrick M. Hanlon & Anne Sme-tak, Asbestos Changes, 62 N.Y.U. Ann. Surv. Am. L. 525, 532 (2007); Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv. J.L. & Pub. Pol'y 541, 546-47 (1992).

. Chaisson v. Avondale Indus., Inc., 947 So.2d 171, 183-84 (La.Ct.App.2006); Zimko v. Am. Cyanamid, 905 So.2d 465, 483-84 (La.Ct.App.2005).

. Olivo v. Owens-Ill., Inc., 186 N.J. 394, 895 A.2d 1143, 1148-50 (2006).

. Condon v. Union Oil Co. of Cal., 2004 WL 1932847, at *3-5 (Cal.Ct.App. Aug.31, 2004).

. Rochon v. Saberhagen Holdings, Inc., 140 Wash.App. 1008, 2007 WL 2325214, at *2-4.

. Alcoa, Inc. v. Behringer, 235 S.W.3d 456, 460-62 (Tex.App.2007).

. Martin v. Gen. Elec. Co., 2007 WL 2682064, at *1-9.

.The Texas Court of Appeals noted that in June 1972, OSHA prohibited work clothes from being taken home to be laundered if those clothes had been exposed to asbestos. Exxon Mobil Corp. v. Altimore, 256 S.W.3d 415, 422 (Tex.App.2008). In a separate decision, the Texas Court of Appeals also noted that
The first case study of non-occupational asbestos exposure was published in 1965. That study observed patients hospitalized in London with a diagnosis of mesothelioma and noted that out of the 76 patients from whom full occupational and residential histories were obtained, 40 (52.6%) "gave a history of occupational or domestic (living in the same house as an asbestos worker) exposure.” Several witnesses also testified in this case about the regulations instituted in 1972 by the Occupational Safety and Hazard Administration (OSHA) that expressly mandated, for the first time, restrictions on allowing asbestos to be carried home on clothing. The record in this case also reflects that the first epidemiological study of the link between females with mesothelioma and non-occupational asbestos exposure was published in 1978.
Alcoa, Inc. v. Behringer, 235 S.W.3d at 461.
Ms. Satterfield’s exposure could not have occurred prior to 1979; accordingly, the foreseeability concerns raised in the Texas cases do not apply to the present case.

. CSX Transp., Inc. v. Williams, 278 Ga. 888, 608 S.E.2d 208, 209-10 (2005).

. Adams v. Owens-Ill., Inc., 119 Md.App. 395, 705 A.2d 58, 66 (1998). While there have been conflicting interpretations of this decision, the Maryland Supreme Court has placed this case squarely within the no duty ■ column. Doe v. Pharmacia & Upjohn Co., 388 Md. 407, 879 A.2d 1088, 1096 (2005) (interpreting Adams v. Owens-Ill., Inc.); compare In re Asbestos Litig., 2007 WL 4571196, at *3 n. 19, *11, with Martin v. Gen. Elec. Co., 2007 WL 2682064, at *6.

. In re Certified Question from Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 213.

. In re New York City Asbestos Litig., 5 N.Y.3d 486, 806 N.Y.S.2d 146, 840 N.E.2d 115, 122-23 (2005).

. In re Asbestos Litig., 2007 WL 4571196, at *11-12.

. Under New Jersey law, foreseeability is "a crucial element in determining whether imposition of a duty on an alleged tortfeasor is *373 appropriate.” Olivo v. Owens-Ill., Inc., 895 A.2d at 1148.

.The opinion in the In re New York City Asbestos Litigation case indicates that the employee appeared to have ignored the steps taken by the employer to ensure that the transmission of asbestos fibers did not occur beyond the work premises. Based on the facts alleged in Ms. Satterfield’s complaint, Mr. Satterfield was unaware of the dangers of asbestos or that he was working with materials that contained asbestos, and Alcoa actively discouraged its employees from using the on-site bathhouse facilities. Accordingly, unlike the employee in the New York litigation, Ms. Satterfield’s complaint provides no basis for concluding that Mr. Satterfield circumvented Alcoa's precautions against the transmission of asbestos fibers.

. In re Asbestos Litig., 2007 WL 4571196, at *11.

. See CSX Transp., Inc. v. Williams, 608 S.E.2d at 209-10.

. See Adams v. Owens-Ill., Inc., 705 A.2d at 66.

. In re Certified Question from Fourteenth Dist. Ct.App. of Tex., 740 N.W.2d at 211-13.

. Satterfield v. Breeding, 2007 WL 1159416, at *9.

. Satterfield v. Breeding, 2007 WL 1159416, at *9.

. See Condon v. Union Oil Co. of Cal., 2004 WL 1932847, at *5; Chaisson v. Avondale Indus., Inc., 947 So.2d at 183-84; Zimko v. Am. Cyanamid, 905 So.2d at 485; Olivo v. Owens-Ill, Inc., 895 A.2d at 1149.

. Our ruling today should not be interpreted as approving claims by unimpaired persons or mass tort actions. These sorts of claims would require reconsideration of the public policy questions addressed in this case. While not foreclosing such liability, the magnitude of the harm and burden on the employer in these circumstances would be significantly different.